Jacqueline **WASHINGTON**,
Plaintiff–Appellee,

v.

L. **NEWSOM**; R. Phillips; J. Thomas; the City of Southfield; and the Southfield Police Department, Defendants–Appellants.

No. 91–2355.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 10, 1992.

Decided Oct. 15, 1992.

Rehearing and Rehearing En Banc Denied Dec. 21, 1992.

Joseph L. Hardig, Jr. (briefed), Bradley S. Stout (argued), Hardig & McConnell, Bloomfield Hills, Mich., for plaintiff-appellee.

Marcia L. Howe (argued and briefed), Cummings, McClorey, Davis & Acho, Livonia, Mich., for defendants-appellants.

Before: KEITH and BATCHELDER, Circuit Judges; and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

During the evening hours of October 26, 1989, two brothers, Mark Preston and Marcus Preston, were leaving the Northland Mall in Southfield, Michigan. As they approached a nearby bus stop, William Ellington, Jr. and his companion, Jerry Blessit, approached the Prestons in a black Ford Escort. A gun was brandished from inside the car toward Marcus, who was then robbed. Mark ran into the Northland parking lot and there encountered Southfield Police officers, Newsom and Durbin, part of a surveillance team stationed there.

Mark described the robbery of his brother and advised that the occupants of the Escort were armed.[1] Marcus then confirmed that the *passenger* in the car had a long black gun. There is a dispute as to whether either of the Prestons talked about a handgun. The district court found, however, that they told the officers they had seen only one gun. Durbin relayed information about the armed robbery over the police radio to others in the surveillance team, while Newsom, a defendant in this case, left to look for the Escort. Officer Clifford, another member of the surveillance operation, also began to search for the vehicle and its occupants, accompanied by the Prestons. Officers Phillips and Thomas, also defendants, heard the radio transmissions and joined the search.

Clifford observed the black Escort in the parking lot, and advised the Prestons to exit the unmarked police car. Members of the police surveillance team followed and observed the suspects in their car, who then approached a lone woman walking across the parking lot that was described by the district court as "well lighted." The police officers then watched as the suspects proceeded in an attempt to commit a second armed robbery. Defendants Phillips and Thomas saw Blessit, the passenger, lean out the Escort window and point a gun at the intended victim, Sylvia Harding. Clifford did not see either of the suspects

---

1. Mark Preston told Newsom and Durbin that the gun came from the passenger's window, and that "it was a long gun ... like a shotgun."

with a weapon, but heard on a police radio transmission that Blessit possessed a gun.

Defendant Newsom then intentionally drove his unmarked car into the front of the Escort to interrupt the robbery in progress and prevent flight as the other police approached. The police exited their vehicles, and Blessit pointed the gun in Phillips' direction. Simultaneously, Newsom, Phillips, and Thomas fired on the Escort.[2] Ellington, the driver, immediately exited the car to flee from the scene. Newsom fired five to seven rounds and Phillips fired two rounds at Ellington as he ran away from them. Thomas did not fire any rounds at Ellington after he exited the Escort.[3] Newsom or Phillips hit Ellington as he fled with at least one of their shots. He suffered serious injuries and died several months later from complications resulting from the gunshot wound or wounds. It was later determined that Ellington was not armed and the police uncovered only one weapon from the scene—Blessit's rifle.[4]

Plaintiff Jacqueline Washington brought this suit as Ellington's personal representative under 42 U.S.C. § 1983 and Michigan tort law alleging that the individual defendants used excessive force; that the City and its Police Department failed adequately to train the three officer-defendants; and that the Police Department maintained an unconstitutional deadly-force policy. There was also a count of negligence and gross negligence. A joint motion for summary judgment was filed by all defendants, contending that the plaintiffs cannot make out an excessive use of force claim against the City or the individual officers because the City has a deadly force policy which is constitutionally sound, the City's police officers are trained in the use of deadly force in compliance with the policy, the individual defendants' actions in this case were reasonable, and those defendants are entitled to qualified immunity. The district court denied the motion for summary judgment

as to all defendants, and both the City and the individual defendants have appealed that denial.

The district court assumed "the existence of a causal link between the [Southfield] policy and the alleged deprivation of Ellington's constitutional rights." The district court denied Southfield's summary judgment motion to the effect that it had adopted and followed a constitutional policy on use of deadly force. Southfield has also appealed this decision.

The only basis for appellate review of the district court's opinion and denial of defendants' motions for summary judgment at this juncture is the interlocutory appeal by defendants, Newsom and Phillips, on their claims of qualified immunity. We dismiss the appeal of the City of Southfield for lack of appellate jurisdiction, because its claims are not based on qualified immunity. *See Rich v. Mayfield Heights*, 955 F.2d 1092, 1094 (6th Cir.1992).

Review of the district court's qualified immunity decision is *de novo*. *Yates v. City of Cleveland*, 941 F.2d 444, 446 (6th Cir.1991). We employ the same summary judgment standard employed by the district court. Summary judgment is appropriate when the depositions, affidavits, and other evidence, taken in the light most favorable to the non-moving party, demonstrate that there are no genuine issues of material fact left for resolution at trial, and the moving party is entitled to a decision in its favor as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Police officers performing " 'discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Russo v. City of Cincinnati*, 953 F.2d

---

**2.** Phillips fired four rounds into the car, while Newsom fired eight rounds and Thomas fired twelve rounds; a total of forty-seven shots were fired by the officers in this episode.

**3.** Thomas has been dismissed from this case.

**4.** Blessit dropped the rifle, exited the Escort, and also attempted to flee. Officers apprehended him after a short chase.

1036, 1042 (6th Cir.1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

When a claim to qualified immunity is raised within the context of a motion for summary judgment, the non-movant must allege facts sufficient to indicate that the act in question violated clearly established law at the time the act was committed. *See Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir.1987).... Thus, the plaintiff must effectively pass two hurdles when facing a defendant on summary judgment who claims qualified immunity. First, the allegations must "state a claim of violation of clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526 [105 S.Ct. 2806, 2815, 86 L.Ed.2d 411].... (1985). Second, the plaintiff must present "evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts."

*Russo*, 953 F.2d at 1043. The real issue in this case, then, is whether, under the circumstances, the defendant police officers violated the decedent's clearly-defined constitutional right which would be known to reasonable officers in defendants' position.

The Supreme Court has determined that [w]here ... [an] excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person.

*Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).[5] Police conduct is examined to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their intent or motivation ... judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 397, 396, 109 S.Ct. at 1872.

"The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon." *Tennessee v. Garner*, 471 U.S. 1, 9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985). *Garner* is the leading case on the constitutionality of the use of deadly force by police officers in the situation involving a fleeing felon. The Court reasoned:

The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead....

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12, 105 S.Ct. at 1701–02.

The issue before the district court regarding qualified immunity was whether the objectively reasonable officer would have known that shooting Ellington as he fled from the automobile violated Ellington's constitutional right not to be subjected to an excessive use of force. In order to resolve that issue, *Garner* requires us to make certain determinations. Under the

5. *Graham* was decided some six months before the episode in question.

circumstances of this case, should objectively reasonable officers have realized that Ellington was, in fact, not armed? Did the officers have probable cause to believe that Ellington posed a threat of serious bodily harm to them or to others? Did Ellington commit, or was he in the process of committing, a crime involving the infliction of serious physical harm? Was deadly force necessary to prevent Ellington's escape? Was Ellington given warning, or was one necessary under the circumstances?

The defense of qualified immunity in this case is dependent upon the resolution of these factual issues, and in particular on the facts relative to Ellington's flight from the car in the presence of a number of police officers. The district court found, and we agree, that the facts surrounding those inquiries are not undisputed.

The requirements of *Garner* and *Graham* are difficult ones imposed upon police officers, even when actually witnessing an armed robbery with two assailants or conspirators actively involved in another such robbery. The district court was doubtless correct in observing that "it is constitutionally unreasonable to use deadly force against a fleeing felony suspect who is unarmed and nondangerous."

While the qualified immunity question is a close one, and although we believe the answers to some of the questions we have posed may be favorable to the defendants, we must now look to the burden of proof with respect to the qualified immunity issue.

We have only recently addressed the burden of proof in qualified immunity cases:

> The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991). Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question. *Id.* Thereafter, the burden shifts to the plaintiff to establish that the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct. *Id.* However, "summary judgment would not be appropriate if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.... Summary judgment also should be denied if the undisputed facts show that the defendant's conduct did indeed violate clearly established rights. In either event, the case will then proceed to trial, unless the defendant takes a successful interlocutory appeal on the issue of qualified immunity." *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989) (citations omitted). *Accord Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir.1989).

*Rich*, 955 F.2d at 1095. *See also Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1503 (11th Cir.1990) (once defense of qualified immunity is raised on summary judgment, plaintiff must adduce evidence to raise a genuine issue of material fact as to whether defendant's conduct violated rights guaranteed by clearly established law).

We may not decide as a matter of law the issue of whether a reasonable officer could have believed his actions were lawful. *See Stewart*, 908 F.2d at 1503. There is a factual dispute, as pointed out by the district court, about the precise information possessed by defendant officers about whether Ellington was probably armed at the time they began shooting at Ellington as he fled from the Escort. Reasonable finders of fact might disagree as to whether, at the time of the flight, an objective police officer should have perceived Ellington as "unarmed" or "nondangerous," particularly in view of the number of police officers present.

In sum, we are persuaded that, under the *Rich* rationale, there is a "genuine issue of

material fact involving an issue on which the question of [qualified] immunity turns." *Rich,* 955 F.2d at 1095. We find no error in the district court's finding that "there is a dispute over the physical facts of this case and the inferences that may be drawn from them."

In light of the defendants' motion for summary judgment based upon claims of qualified immunity, we have resolved, for purposes of our decision, all reasonable inference in favor of the non-movant plaintiff who opposes the motion. Under the circumstances, "the legal question of immunity is dependent upon which view of the facts" the trier of fact accepts. *Brandenburg v. Cureton,* 882 F.2d 211, 216 (6th Cir.1989). At the same time, we reiterate that we are not called upon to rule on any disputed factual determinations *at this juncture,* and the ultimate burden is upon plaintiff to establish that defendants are not entitled to qualified immunity. Plaintiff has the burden to show that the defendants violated a clearly established constitutional right, viewing the defendants' actions by the measure of reasonable and objective standards. *Poe v. Haydon,* 853 F.2d 418, 424–426 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). Nor are we at this point called upon to decide whether Ellington was acting as a co-conspirator with his armed companion, Blessit, and whether he might be bound in some fashion by Blessit's conduct and use of the gun at the scene.

We AFFIRM the denial of the defendant officers' motion for summary judgment based upon the affirmative defense raised by qualified immunity. We DISMISS the appeal of the municipality for lack of appellate jurisdiction. We do not decide the question of the constitutionality of Southfield's policy on use of deadly force.